## JOSEPH PALYS

*v.*

## RECEIVER OF THE ERIE RAILWAY COMPANY.

1. A person who is injured by a collision with a railroad train, is not entitled to damages if it appears that his negligence was the proximate cause of the collision, or materially contributed in producing it.

2. Contributory negligence is such want of care as materially helps in producing the disaster.

3. A person who attempts to cross a railroad when he knows a train is due, and that he cannot make the passage in safety if the slightest delay or mishap occurs to him, is guilty of negligence, and if he is injured by a collision has no right to damages.

On petition for a remedy for damages alleged to have been sustained in consequence of the negligence of the receiver in operating the railway under his charge. Heard on proofs taken orally.

*Mr. Jos. A. McCreery* and *Mr. L. Ruser*, for petitioner.

*Mr. R. W. Parker* and *Mr. Cortlandt Parker*, for receiver.

THE VICE-CHANCELLOR.

The petitioner seeks to recover damages for the loss of an arm and the destruction of his horse and wagon. He was struck by the locomotive of a passenger train on the railway operated by the defendant, while attempting to cross the railway at Rutherford Park, on a public road known as Union avenue, on the evening of December 1st, 1877. His horse was killed, and his wagon so entirely destroyed as to be useless, and his right arm so badly crushed and broken as to render amputation necessary. The defendant denies negligence, and insists that the evidence shows that the petitioner's injuries resulted from his own carelessness.

If the petitioner was careless, and his carelessness was the proximate cause of his injuries, or materially contributed in producing them, though he may have shown that the defendant's employes were also careless, and that their carelessness also contributed in producing his injuries, he has no right to damages, for, in that case, his misfortunes would, in a material degree, be the result of his own fault. *Drake* v. *Mount*, 4 *Vr.* 441; *Harper* v. *Erie Railway Co.*, 3 *Vr.* 88; *Blaker's ex'rs* v. *N. J. Midland Railway Co.*, 3 *Stew.* 240. Contributory negligence is such want of care on the part of the person injured as materially helps in producing his injury.

On behalf of the defendant, it is insisted that the proofs show that the petitioner either heedlessly drove directly in front of the locomotive, or that he went upon the railway when he knew a train was due at the point where he attempted to cross, and that it would be impossible for him to make the passage in safety if the slightest delay or mishap occurred. The evidence produced by the petitioner designed to show the position of the train with reference to the crossing at the time he attempted to cross, is very contradictory. If the testimony of the boy, who was with him in the wagon at the time the collision occurred, is believed, there can be no doubt he drove upon the railway in the very blaze of the headlight of the locomotive. There seems to be no dispute that his horse stopped immediately after crossing the track on which the colliding train was running, leaving his wagon standing across the track. The boy says: " When the horse stopped, I went to jump off, but I got no chance, because the train hit us. I had no chance to get off before the train hit us, it came so quick." He also says : " The engine came as soon as the horse stopped. I did not have time to jump from the wagon between the time the horse stopped and when the engine struck us, it was so short." If this is a correct statement of the facts, it can scarcely be disputed that the petitioner drove upon the track with his eyes and ears shut, or, if he had them open,

he was fully conscious of the extreme peril of his experiment, but rashly determined to risk it. In either case, he must be regarded as the author of his misfortunes.

But the decided weight of the evidence is against the correctness of this view. A clear preponderance of the evidence shows that the petitioner drove upon the track before the train rounded the curve, and before the headlight could be seen from the point where he was. The petitioner himself swears that before driving upon the track, and also after he got upon it, he looked and listened, but neither saw nor heard anything which gave notice of the approach of a train. In consequence of the darkness of the night, the rays of the headlight must have been very conspicuous, and if the locomotive had then turned the curve, and the petitioner had looked in that direction, he could not have failed to see the light. His witness, Henry Gaede, who was standing near the depot, and over two hundred feet further south from the curve, says: "I saw the headlight as it came around the curve; when I first saw it I looked at the top of the smoke-stack and then down, and saw a wagon on the track; I think the wagon was on the track when the train came round the curve; I did not take much notice of it, for I thought it had ample time to get across." And William Dooley, the locomotive engineer, says: "I observed a horse and wagon on the track when we were about eight hundred feet from them, as near as I could judge; I supposed they were crossing, but on closer observation I saw they did not move, and then I gave the signal to apply brakes, reversed my engine, and blew three or four sharp whistles." If Gaede's evidence is believed, it is certain the petitioner drove upon the track either before or just as the locomotive rounded the curve, and if the petitioner's own testimony is fully credited, it is clear he went there before the headlight could be seen, and, of course, before the locomotive had rounded the curve. The petitioner had just returned from New York, on a train reaching the depot at Rutherford Park at fifty-seven minutes after five, and he says he knew

the next train going south was due at that station at two
minutes after six, leaving an interval of only five minutes
between the arrival of the train on which he was a passen-
ger, and the arrival of another going in the opposite direc-
tion.   On leaving the depot he walked a distance of over
three hundred feet in search of his wagon, stopping only a
few seconds to talk to an acquaintance.   He found his horse
and wagon at the corner of Erie and Union avenues, a few
feet west of the crossing; he says he put his bundles into
the wagon, and then entered himself, and "sat some,"
waiting and listening for the train, but heard nothing; he
then turned his horse and wagon about and drove upon the
track; meanwhile, he says, he looked and listened, but saw
nothing, and heard nothing indicating the approach of a
train.   The time thus consumed was nearly or fully equal
to the interval between the two trains; when, therefore, he
drove upon the track, he knew a train was due, and would
pass in a very short time.   Reasonable caution, in view of
the danger of the place and the darkness, required him to
wait until the train had passed, or, if he went on in advance
of it, to make use of such safeguards as would be certain to
ensure his safety.   In attempting to cross at the time he
did, he rashly placed himself in a position of imminent
peril, and was, therefore, bound to use extraordinary caution
and vigilance to guard against disaster, or bear the conse-
quences of his temerity.   When it is shown that the person
seeking compensation for injuries resulting from a collision
with a railway train, was accustomed to pass the crossing
where the collision occurred, and knew the time when the
colliding train would pass, and the rate of speed at which it
usually passed, he will be held bound to exercise such
caution and care as are necessary to avoid a collision, pro-
vided the train passed on time and at the usual rate of
speed.   *Continental Improvement Co.* v. *Stead,* 5 *Otto* 161.

The railway at the place where the collision occurred,
consists of three tracks—the west track is used by trains
going south, the next by trains going north, and the third

for switching.   The colliding train was on the west track,
moving south.    The petitioner, in attempting to cross,
moved eastward.   He says his horse walked forward stead-
ily until he crossed the west track, and was there stopped
by a freight car standing on the switch, directly across
Union avenue.   He says the car stood right in front of his
horse when he stopped.    When the horse stopped, he says
he first made an effort to drive around the car, but the horse
refused to go ; he then applied the whip, but the horse still
refused to move, and he then tried to pull him back, and
while so engaged the locomotive struck him.    That part of
Union avenue which is laid on the road-bed of the railway,
and is actually used by vehicles for travel, is planked, plank
being laid both between the tracks and at their sides, but
the planking does not extend across the whole width of the
road, as laid out.   There is some evidence tending to show
that the freight car, on the night in question, stood so far
in the roadway as to project over the northerly portion of
the planking ten or twelve feet, but this evidence is entitled
to very little weight when contrasted with that of the person
who had the car put in position to be unloaded, and after-
wards had it removed. and of another who was about it all
day, unloading it, and who was in it at the time of the col-
lision.   They say that it stood in the roadway a few feet,
but did not project over the planking, nor at all impede or
obstruct travel over that part of the roadway used by
vehicles.   This, I am convinced, was the fact.   And I am
also satisfied that the car was not in position to obstruct the
petitioner's passage, unless he was attempting to make a
passage aside from the usual line of travel.

But it is quite obvious, I think, if the petitioner has cor-
rectly described the conduct of his horse, that he negli-
gently suffered himself to be detained upon the railway for
an unnecessary period of time.   According to his narrative
of the occurrence, when the horse was driven in front of the
car he stopped, but gave no evidence of fear or fright; he
showed no desire to escape by rushing to the one side or the

other, or by falling back; he simply stopped and sullenly refused to move; when the bit was applied to change his course he refused to obey it, and when an attempt was made to urge him forward by the use of the whip, he still refused to move.    This was the conduct of a balky horse.    As already remarked, the petitioner knew, when he went upon the track, that the train which injured him was then due, or nearly so, and that the slightest delay or mishap in crossing would put him in extreme peril.    He made a hazardous experiment and failed.    If he had seen the train coming, but, notwithstanding, had rashly attempted to cross in advance of it, and had failed and been injured, his injuries would have been esteemed the result of his own fault. *Railroad Co.* v. *Houston*, 5 *Otto* 697.    The present situation, in point of principle, is very little better, for though he says he looked and listened for the train, and did not see or hear it, yet he knew it was due or almost due, and that if he attempted to cross in advance of it the passage must be made quickly, and without delay or accident, or he would be in danger of being run down.    Besides, it is important to observe that it appears he had sufficient time to escape, after he had an opportunity to receive full warning of his peril, but neglected to use it.    The distance from the point where he stood to the point where the headlight was first visible, after the locomotive rounded the curve, was over three thousand feet.    The whistle was blown as the train rounded the curve, and the headlight was thrust into full view the moment it turned the curve.    As the train rounded the curve it was moving at a speed of twenty miles an hour, and when within about eight hundred feet of the petitioner the brakes were applied and the engine reversed.    But if we say it continued at the same speed until the collision occurred, a period of over one minute and forty seconds elapsed between the time the headlight first came in sight and the collision.    The instant his horse stopped, it was the duty of the petitioner to look towards the point of danger; a reasonable regard for his own safety demanded that he

should do so, and there can be no doubt, I think, that had he even cast a glance towards the point of peril when he found his horse refused to move, he could have averted the disaster, or at least made a safe escape himself. In my judgment, the fact that the petitioner went upon the railway when he knew that a train was due or almost due, at the point where he attempted to cross, and that he remained there, almost in the very blaze of the headlight, for a period sufficient to have enabled him to make good his escape, presents a case of such strong, contributory negligence as cuts him off from all right to compensation for his injuries.

His petition must be dismissed.